**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **LORI PANARELLO,** |
| Plaintiff, |
| v. |
| **DAVID L. BERNHARDT**, *in his official capacity as Secretary, United States Department of the Interior*, |
| Defendant. |

Case No. 1:17-cv-02103 (TNM)

## MEMORANDUM OPINION

Lori Panarello filed this employment discrimination-related lawsuit while another case she brought against the same defendant alleging very similar claims was still pending in this courthouse. That action was ultimately unsuccessful. Her case here meets the same fate.

Panarello challenges her termination as a United States Park Police supervisor following her guilty plea for driving while intoxicated ("DWI"), her third disciplinary infraction overall and second involving alcohol. She sues the Secretary of the Department of Interior, who has ultimate authority over the Park Police, under Title VII. She claims that the Park Police discriminated against her on the basis of sex and sexual orientation and removed her in retaliation for her other Title VII lawsuit, as well as another Title VII action she filed more than fifteen years ago.

The Secretary moves for summary judgment, citing the DWI as the reason for Panarello's removal. Panarello pursues several paths to show that her criminal conviction was not the actual reason for her removal. But each path leads to the same dead end. The evidence, even when viewed in the light most favorable to her, would not allow a reasonable jury to find that the Park

Police intentionally discriminated or retaliated against her.  The Court will therefore grant the Secretary's motion.

## I.

Panarello is a homosexual female who worked for the Park Police, achieving the rank of lieutenant.  *See* Compl. ¶¶ 9–10, ECF No. 1; Def.'s Mem. in Supp. Mot. Summ. J. ("Def.'s Mem.") Ex. A ("Panarello Dep. Tr.") 13:4–5, ECF No. 33-4.[1]

The current case centers on Panarello's 2015 guilty plea to a DWI.  *See* Pl.'s Statement of Genuine Issues of Fact ("Pl.'s Statement") ¶ 31, ECF No. 35-8 (Redacted); Panarello Dep. Tr. 47:11–13; *see also* Pl.'s Resp. & Mem. in Opp'n Summ. J. ("Pl.'s Resp.") Ex. 3 ("Panarello Aff.") ¶ 81, ECF No. 35-3 (Redacted).  She had been driving back from a funeral when a deputy sheriff pulled her over near her home in Virginia.  *See* Panarello Dep. Tr. 18:17–19:7; Pl.'s Statement ¶ 13.  The deputy determined that Panarello had a blood alcohol content of .13. Panarello Dep. Tr. 46:8–16.  During the stop, the deputy sheriff discovered that Panarello was a police officer.  *Id.* 43:13–17.  After Panarello appeared before a magistrate, the deputy allowed a Park Police supervisor to drive Panarello home, rather than leaving her in the county jail to sober up.  *Id.* 54–55; Pl.'s Statement ¶¶ 28–29.

---

[1] Panarello failed to "submit a statement enumerating all material facts which [she] contends are genuinely disputed and thus require trial," as this Court requires.  Standing Order ¶ 14(B)(i), ECF No. 14.  She instead objected to many of the Secretary's proposed facts as "misleading," "incomplete," or both.  Pl.'s Statement of Genuine Issues of Fact, ECF No. 35-8 (Redacted). Since the Court must construe the evidence in the light most favorable to Panarello, it relies on the evidence that she provides whenever possible, and only resolves Panarello's objections to the Secretary's proposed facts as necessary.

Unless a deposition transcript, page citations refer to the pagination generated by the Court's CM/ECF system.  Page citations for deposition transcripts refer to the pagination of the transcript.

The DWI was not Panarello's first infraction.  In 1996, Panarello was stopped for speeding and "there was alcohol involved."  Panarello Dep. Tr. 63:22–64:2; *see also* Panarello Aff. ¶ 29.[2]  As in the 2015 stop, Panarello's blood alcohol content registered at .13, well over the legal limit.  *See* Panarello Aff. ¶¶ 30–38.  But the officer learned Panarello was a law enforcement officer, and Panarello was not charged with a DWI, nor did she receive a ticket.  *See id.* ¶ 39; Panarello Dep. Tr. 64:19–21, 171:4–6.  Instead, he called a tow truck because he did not want Panarello driving her car home.  Panarello Aff. ¶¶ 40–41.  Before the tow truck arrived, however, Panarello let a friend drive her car home.  *Id.* ¶¶ 42–43.  Learning that Panarello's car was not there when the tow truck arrived, the police officer notified the Park Police of the incident.  *Id.* ¶¶ 44, 47.  The Park Police later suspended Panarello for three days, citing "impairing the efficiency of the force."  *Id.* ¶¶ 48, 50–51; Panarello Dep. Tr. 170:19–21, 171:12–17.

Panarello was also involved in an incident near the Jefferson Memorial, which another court in this District already recounted:

> [O]fficers under Panarello's supervision stopped a vehicle approaching the Jefferson Memorial slightly before 3 a.m. on April 11, 2008, and ordered the occupants out of the vehicle.  When searching the trunk of the car, one of the officers discovered a . . . dildo, and another officer removed it from the trunk and gave it to Panarello, who was at the scene of the stop.  Panarello then placed it on top of the vehicle and called another officer to the scene to take pictures.  The officer Panarello originally called was unable to attend, but he directed another officer to the scene in his place.  At Panarello's request, that officer then took pictures with his personal cell phone while another officer laugh[ed] about the device and engaged in distasteful shenanigans.  The remaining officers at the scene simply looked on, embarrassed by [Panarello's] actions to condone such behavior, particularly in the same vicinity of the . . . occupants of the vehicle the Park Police had stopped and searched.

---

[2]  Panarello filed certain information and exhibits under seal.  In reaching its decision, the Court relies on public information whenever possible.  Any information cited from a sealed exhibit either need not be sealed or is generalized to maintain confidentiality.

*Panarello v. Zinke*, 254 F. Supp. 3d 85, 91 (D.D.C. 2017), *aff'd sub nom. Panarello v. Bernhardt*, 788 F. App'x 18 (D.C. Cir. 2019) (per curiam) (cleaned up).  Panarello received a fourteen-day suspension for this infraction.  *See* Pl.'s Statement ¶ 73.

After Panarello's 2015 DWI, the Park Police investigated and ultimately proposed removing her from the force.  *See id.* ¶ 33; Panarello Dep. Tr. 17:19–21.  It sent Panarello a "Notice of Proposed Removal" ("Removal Notice"), signed by Captain Keith Rogers.  *See* Def.'s Mem. Ex. H, ECF No. 33-11.[3]  The Removal Notice outlined the Park Police's considerations for removing Panarello, including the nature and seriousness of the offense and Panarello's supervisory position.  *See id.* at 3–5.  The Park Police also considered Panarello's two prior infractions because it used a progressive discipline system—more violations lead to more severe penalties.  *Id.* at 4; *see* Def.'s Mem. Ex. S ("Table of Penalties") (reflecting increasing penalties after first, second, and third offense), ECF No. 33-22; *id.* Ex. D ("Smith Dep. Tr.") 65:18–66:4, ECF No. 33-7 (describing decision based on progressive discipline).  Panarello addressed her proposed removal through an oral and written response.  *See* Def.'s Mem. Ex. K, ECF No. 33-14; Panarello Aff. ¶ 87.

The Park Police sustained the recommendation to remove Panarello in a "Decision on Proposed Removal" ("Removal Decision"), signed by Deputy Chief Scott Fear.  *See* Pl.'s Statement ¶ 51; Def.'s Mem. Ex. L, ECF No. 33-15.  The Removal Decision identified the same

---

[3]  Panarello moves to strike as hearsay various documents that the Park Police submits as evidence.  *See, e.g.*, Pl.'s Statement ¶ 14 (seeking to strike DWI arrest report); *id.* ¶ 37 (seeking to strike Removal Notice); *id.* ¶ 49 (seeking to strike Removal Decision).  "A motion to strike is considered an exceptional remedy and is generally disfavored, and the proponent of such a motion must shoulder a formidable burden."  *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 53 (D.D.C. 2006) (cleaned up).  The Court will resolve the requests to strike only for those documents on which it relies to reach a decision.  *Accord Tsehaye v. William C. Smith & Co.*, 402 F. Supp. 2d 185, 195 n.3 (D.D.C. 2005) (declining to strike evidence not necessary to the court's disposition of the case).

considerations as the Removal Notice for removing Panarello, such as the seriousness of a DWI, Panarello's position as a lieutenant, and that the DWI was Panarello's third infraction. *Id.* at 3–5. Fear noted that he was "unaware of any other employees who have been disciplined for the same or similar offenses." *Id.* at 4. But he continued that, in any event, Panarello's "misconduct [was] serious enough to warrant removal, irrespective of similar cases." *Id.*

Before the removal became effective, Panarello submitted her retirement paperwork. Pl.'s Statement ¶ 63. A member of the Park Police's human resources staff also offered Panarello a "last chance agreement." *See* Pl.'s Resp. Ex. 5 ("Payton-Williams Dep. Tr.") 10, 85–87, ECF No. 36-9 (Sealed). A last chance agreement holds a termination in abeyance for a certain period until the employee complies with the conditions of the agreement. *See id.* 85:8–20. Under the proposed agreement, Panarello had to drop an earlier equal employment opportunity ("EEO") complaint she had filed against the Park Police. *Id.* 87:2–8. Panarello declined this offer. *See* Pl.'s Statement ¶ 62. She then retired and receives annuity benefits. *See* Panarello Dep. Tr. 158:12–16.

*    *    *

Panarello has twice before sued the Secretary for alleged Title VII violations. In 1998, Panarello and other female officers claimed that a sergeant "subjected them to gender discrimination and sexual harassment on a continuing basis," "imposed unwarranted discipline," "made unsubstantiated complaints against them," and threatened retaliation for their complaints about his behavior. *See* Compl. at 7, 9, *Sabate v. Babbitt*, No. 98-cv-929 (D.D.C. Apr. 14, 1998) ("*Sabate* lawsuit"), ECF No. 1. The Park Police settled and agreed to promote Panarello to sergeant, among other things. Stipulation, *Sabate* lawsuit, ECF No. 36.

More than a decade later, Panarello sued the Secretary again.  *See Panarello v. Zinke*, 254 F. Supp. 3d 85 (D.D.C. 2017) ("*Panarello I*").  There, Panarello alleged several acts of discrimination by the Park Police, including the failure to promote her to captain and assign her to command positions, as well as her suspension for the Jefferson Memorial incident.  *Id.* at 90–93.  She also claimed that a Park Police lieutenant retaliated against her for the *Sabate* lawsuit.  *Id.* at 90.  Panarello relied in part on her proposed removal from the Park Police to support her claims in *Panarello I*.  *Id.* at 92–93.

*Panarello I* did not survive summary judgment.  As relevant here, Judge Moss determined that Panarello's evidence—including her proposed removal—was "too thin."  *Id.* at 106.[4]  The lieutenant at the center of Panarello's retaliation claim had retired before her nonselection to captain-level and command positions, as well as her proposed removal.  *Id.* at 106–08.  Addressing Panarello's proposed removal, Judge Moss explained that, "[o]nce again, Panarello points to no evidence that sex discrimination motivated the Park Police's action," and that she "fails to offer any evidence that the proposed termination was part of a pattern of retaliation against her."  *Id.* at 107.  Judge Moss found "no basis in the record from which a reasonable jury could find that the proposed termination was part of a pattern of retaliation that would not have occurred but for Panarello's EEO activity between 1993 and 2000."  *Id.*

The D.C. Circuit affirmed.  *See Panarello v. Bernhardt*, 788 F. App'x 18 (D.C Cir. 2019) (per curiam) ("*Panarello II*").  It held that "no reasonable jury could find that the Park Police subjected Panarello to disparate discipline in retaliation for her EEO activity."  *Id.* at 19.  And that Panarello "present[ed] no evidence sufficient to create a triable factual dispute over the

---

[4]  The court also found that Panarello failed to exhaust her administrative remedies as to certain claims, including her allegations of a hostile work environment.  *See Panarello I*, 254 F. Supp. 3d at 95–103.

agency's non-discriminatory reason" in imposing the fourteen-day suspension "for failing to prevent, and even participating in, admittedly juvenile and unprofessional acts in the presence of members of the public." *Id.* "Panarello's allegations rest[ed] on a theory of retaliation without evidentiary support." *Id.* at 20.

*     *     *

Shortly after *Panarello I* and while *Panarello II* was still pending, Panarello sued the Secretary for sex and sexual orientation discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*[5]  *See* Compl. ¶¶ 51–54.  She claims her removal for the DWI was harsher than the discipline her male, heterosexual colleagues received for alcohol-related offenses. *Id.* ¶¶ 42–45.  And that the removal was retaliation for *Panarello I* and the *Sabate* lawsuit. *Id.* ¶¶ 27–31.  Panarello also alleges that her treatment "constituted a discriminatory, hostile work environment for [her] in violation of her rights under federal law." *Id.* ¶ 18.

The Secretary moves for summary judgment.  His main contention is that the DWI was the reason for Panarello's removal and that Panarello cannot identify sufficient facts to show otherwise.  *See* Def.'s Mem. at 23–40.  This motion is ripe for disposition.[6]  Pl.'s Resp.; Def.'s Reply in Supp. Mot. for Summ. J. ("Def.'s Reply"), ECF No. 40.

---

[5]  Although Panarello captions her discrimination claim as "sex-based" in her complaint, she also refers to her sexual orientation and alleges disparate treatment from her "heterosexual male colleagues." Compl. ¶¶ 9, 42, 51–52.  The Court thus construes Panarello to be pursuing discrimination based on sex and sexual orientation.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020).

[6]  The Court has jurisdiction under Title VII's jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3), and the federal question statute, 28 U.S.C. § 1331.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 503 (2006).

## II.

A party seeking summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one that could alter the outcome of the suit based on the substantive law that governs.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over that material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up).  The non-moving party then must set forth "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (cleaned up).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

In construing a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

## III.

Title VII contains anti-discrimination and anti-retaliation provisions.  As relevant here, the statute bars an employer from terminating or discriminating against an individual on the basis of sex, *see* 42 U.S.C. § 2000e–2(a)(1), or from discriminating against an employee "because he

has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter," *id.* § 2000e–3(a).

"Discrimination and retaliation claims are subject to the familiar, burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). Under this framework, a plaintiff first must establish a prima facie case. For discrimination claims, the plaintiff must show: "she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Id.* A plaintiff pursuing a retaliation claim similarly must show: "she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Id.* at 1091–92. The burden then shifts to the employer to identify a "legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Id.* at 1092.

Once the employer provides such a reason, the "court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, "the central question at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker*, 798 F.3d at 1092 (cleaned up).

Courts do not sit as a "super-personnel department." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (cleaned up). They cannot "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (cleaned up). "The ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

### A.

The Park Police identifies the DWI as the reason for Panarello's removal.  *See* Def.'s Mem. at 23–25.  It considered the DWI to be a "very serious" offense that went "to the heart of [Panarello's] responsibility as a [Park Police] officer and manager."  Removal Notice at 3; *see* Removal Decision at 3 (describing the DWI as "extremely serious").[7]  To the Park Police, the DWI had a "direct relation to [Panarello's] duties" because she was "entrusted with the enforcement of laws prohibiting drinking and driving."  Removal Decision at 3.

Panarello's role as a supervisor was also a "highly aggravating factor."  Removal Notice at 3.  The Park Police noted that Panarello was "held to a higher standard of conduct" as a lieutenant and was "responsible for setting an example for subordinate officers to follow."  *Id.*; *see also id.* (explaining that Panarello was "required to make significant decisions and represent the Chief of Police as the highest ranking official during [her] work shift").  The Park Police

---

[7]  Panarello moves to strike the statements in the Removal Notice and Removal Decision as inadmissible hearsay.  *See* Pl.'s Statement ¶¶ 37, 49.  The Court denies that request.  "In employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay . . . . Rather such documents are relevant and admissible [as business records] because they help explain (or may help explain) the employer's conduct." *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997).  In *McKenna v. Weinberger*, the D.C. Circuit found that the testimony of plaintiff's supervisors discussing co-workers' complaints about the plaintiff was not hearsay because "[s]uch testimony was offered to illuminate their motives and actions as supervisors, not to prove that the co-workers had valid complaints." 729 F.2d 783, 792 (D.C. Cir. 1984); *cf. Desmond v. Mukasey*, 530 F.3d 944, 965 (D.C. Cir. 2008) (affirming decision to admit report "chronicling" plaintiff's "alleged failures, infractions, and indiscretions" in Title VII retaliation case because the report shows "what information [the charging official] had before him when he made his initial decision regarding [plaintiff]").  Here, the Removal Decision and Removal Notice are business records that help illuminate the Park Police's proffered reasons for removing Panarello.  They are thus admissible evidence to consider at the summary judgment stage.

highlighted the same in the Removal Decision.  It stated that as a "managerial police officer," Panarello was "responsible for providing guidance, advice, and assistance to subordinate officers when they encounter situations similar to [her] instance of misconduct."  Removal Decision at 3.

The Park Police also cited Panarello's two prior infractions—the three-day suspension "for an alcohol-related charge of Conduct" and the fourteen-day suspension for the Jefferson Memorial incident.[8]  Removal Notice at 4; *see also* Removal Decision at 3.  There was a "significant concern" that the DWI was not Panarello's first instance of "alcohol-related misconduct."  Removal Decision at 3.  As Deputy Chief Fear put it to Panarello, "[b]y involving yourself in this type of behavior again, I do not believe that you warrant another opportunity to continue in your career as a manager police officer."  *Id.*

Finally, the Park Police noted the DWI's negative effect on the department's reputation. *See* Removal Decision at 4.  The arresting deputy knew Panarello worked for the Park Police and contacted a Park Police manager to pick Panarello up that evening.  *See* Removal Notice at 4; Removal Decision at 4.

Fear was "unaware of any other employees who ha[d] been disciplined for the same or similar offenses."  Removal Decision at 4.  But he stated that Panarello's "misconduct [was] serious enough to warrant removal, irrespective of similar cases."  *Id.*

---

[8]  Panarello contends that her three-day suspension "had a connection to alcohol, but she was in no way disciplined for an alcohol issue."  Pl.'s Statement at 28; *see also* Panarello Aff. ¶ 29.  It is unclear how this dispute helps Panarello here.  Even if she is correct, the undisputed fact remains that there was "alcohol involved" in the three-day suspension.  Panarello Dep. Tr. 63:22–64:2. And that the Park Police cited this "alcohol-related" infraction as a basis for its removal decision. Removal Notice at 4; *see also* Removal Decision at 3.  If Panarello challenges the Park Police's characterization of the discipline, that dispute is one of semantics, not fact.  *Cf. Fischbach*, 86 F.3d at 1183 ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." (cleaned up)).

Thus, the seriousness of a DWI, Panarello's supervisory responsibilities, her two prior infractions—including another involving alcohol, and the public nature of the DWI warranted Panarello's removal.  The Park Police has identified a legitimate, nondiscriminatory, and non-retaliatory reason for removing Panarello.

**B.**

The burden now shifts to Panarello.  She must "produce[] sufficient evidence for a reasonable jury to find" that the DWI was not the "actual reason" for her removal.  *Brady*, 520 F.3d at 494.  To that end, Panarello can cite "better treatment of similarly situated employees," "inconsistent or dishonest explanations," a "deviation from established procedures or criteria," a "pattern of poor treatment of other employees in the same protected group," or "other relevant evidence that a jury could reasonably conclude evinces an illicit motive."  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (cleaned up).

Panarello draws on a combination of these attacks.  But it is not enough.  The record, even when viewed in the light most favorable to her, fails to show that the Park Police intentionally discriminated or retaliated against Panarello.

**1.**

"One way to discredit an employer's justification is to show that similarly situated employees . . . received more favorable treatment."  *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008).  Panarello tries that path here.  She contends that the Park Police treated her differently than male colleagues involved in alcohol-related offenses, including DWIs.  *See* Pl.'s Resp. at 30–32 ("The record is replete with evidence of other male supervisors involved in DUIs, who were not involved with EEO activity, who received little, if any discipline.").  The Court is unconvinced.

To rely on comparator evidence, Panarello must show that "she and the alleged similarly-situated employee were charged with offenses of comparable seriousness, and that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee."[9]  *Wheeler*, 812 F.3d at 1115–16 (cleaned up).  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).

Panarello identifies two Park Police officers guilty of DWIs who were not terminated. One officer received a 30-day suspension for the DWI, which followed a suspension two years earlier for being "drunk, in a bar, with his service weapon."  *See* Pl.'s Resp. at 32; *id.* Ex. 4 ("Disciplinary Records") at 16–21, 58–62, ECF No. 36-8 (Sealed).  Panarello claims another officer received a two-day suspension for a DWI.[10]  *See* Pl.'s Statement at 20; Disciplinary Records at 11–15.

Panarello also cites two other Park Police officers with DWIs, including one with two DWIs in three years.  *See* Pl.'s Statement at 19–22; Disciplinary Records at 7–10, 36–47, 56–

---

[9]  The Court thus rejects as insufficient broad assertions that Panarello was treated differently than other Park Police officers.  *See* Pl.'s Resp. Ex. 2 ¶ 30, ECF No. 35-2 (Redacted) ("I am familiar with many, many alcohol-related incidents involving both patrol officers and supervisors."); *see also id.* ¶¶ 39–40.

[10]  Panarello offers no cite in the record to support the officer's two-day suspension.  Even so, the Court assumes the officer did in fact receive this discipline.

57.[11]  It is unclear what discipline (if any) the Park Police imposed after the officer's second

DWI and the other officer's only DWI.[12]  *See* Pl.'s Statement at 20, 22.

Even if all four Park Police officers were not removed for their DWIs, these comparators

are not "nearly identical" to Panarello for three reasons.

*First*, Panarello does not establish that any of these officers has the same disciplinary

record as her.  *Accord Gulley v. District of Columbia*, 474 F. Supp. 3d 154, 167 (D.D.C. 2020)

("None of his comparators has a disciplinary record as extensive as his.").  She identifies no

comparator that had more than one prior infraction at the time of the DWI.  *See* Pl.'s Resp. at 32;

Pl.'s Statement at 21–22.  Panarello did.  *See* Panarello Aff. ¶ 50; *Panarello*, 254 F. Supp. 3d at

91–92.  This distinction is significant.  The Park Police uses a progressive discipline system:

more prior infractions lead to more severe penalties.  *See* Table of Penalties (reflecting

increasing penalties after first, second, and third offense); Smith Dep. Tr. 65:18–66:4 (describing

decision based on progressive discipline).  Indeed, the Park Police cited Panarello's two other

violations to justify her removal.  *See* Removal Notice at 4; Removal Decision at 3.

*Second*, none of these officers held supervisory roles at the time of their DWIs.  *See, e.g.*,

Disciplinary Records at 7–15, 16–21, 56–57 (listing individual as an "officer," not a sergeant,

lieutenant, major, or captain); *id.* at 43, 59 ("You are a permanent full-time employee and have

no supervisory role.").  Panarello did.  And the Park Police cited Panarello's managerial

---

[11]  Panarello refers to an "Employee 6" in her opposition, Pl.'s Resp. at 31, but no Employee 6 is referenced elsewhere.  The Court construes Employee 6 to be the "Officer 3" listed in Panarello's response to the Secretary's proposed facts.  *See* Pl.'s Statement of Facts at 21–22.

[12]  Panarello claims that the Park Police represented that the officer with two DWIs was terminated after the second one, but that she could not find support for this fact in its disclosures. Pl.'s Statement at 22.  The Court construes this ambiguity in favor of Panarello and assumes the officer was not terminated after the second DWI.

responsibilities as a basis for its removal decision.  Captain Rogers explained that Panarello was "held to a higher standard of conduct" as a supervisor and was "responsible for setting an example for subordinate officers to follow."  Removal Notice at 3.  Deputy Chief Fear noted that, as a "managerial police officer," Panarello was "responsible for providing guidance, advice, and assistance to subordinate officers when they encounter situations similar to [her] instance of misconduct."  Removal Decision at 3; *see also* Pl.'s Resp. Ex. 1 ("Rogers Dep. Tr.") 31:3–5, ECF No. 36-5 (Sealed) ("An officer would be treated different from a lieutenant because the expectations are different.").

*Third*, "it is far from clear that these comparators were disciplined by the same supervisor" as Panarello.  *Gulley*, 474 F. Supp. 3d at 167 (cleaned up).  Captain Rogers helped draft the Removal Notice, and Deputy Chief Fear signed the Removal Decision.  *See* Rogers Dep. Tr. 26:7–9; Pl.'s Statement ¶ 51.  Panarello has not shown that either participated in the discipline for these other DWIs.  *See* Disciplinary Records.  Indeed, at least some of these comparators were disciplined by other supervisors.  *See id.* at 16, 36, 58.  That different supervisors imposed different discipline on different officers undermines Panarello's theory of disparate treatment.[13]

---

[13]  Lee Gaither—a retired Park Police lieutenant—alludes to two other individuals who had a DWI, including an individual "whom I believe was a major" and another that was "either a sergeant or a lieutenant."  *See* Pl.'s Resp. Ex. 2 ¶¶ 2, 36–37, ECF No. 35-2 (Redacted).  Panarello also refers by name to a captain "involved in a DUI accident in New York."  Panarello Aff. ¶ 88.  But Panarello has not "presented other evidence relevant to the comparability inquiry" for these three individuals.  *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 285 (D.D.C. 2017).  Did any have a prior infraction (let alone two) at the time of the DWIs?  Did either Captain Rogers or Deputy Chief Fear participate in the discipline decisions?  Without more information, the Court cannot conclude that these individuals are "nearly identical" to Panarello.  *See Gulley*, 474 F. Supp. 3d at 167 (finding plaintiff failed to carry his burden of proof when there were "significant gaps in his comparator evidence.").

Each of these differences sinks Panarello's efforts to show that these officers were similarly situated but treated more favorably for a DWI than her.

Panarello also cites other evidence of alleged disparate treatment.  She claims that supervisors "covered" for subordinates who were arrested.  Pl.'s Resp. at 31; *see also* Pl.'s Resp. Ex. 2 ("Gaither Aff.") ¶ 48, ECF No. 35-2 (Redacted).  And that a lieutenant brought a case of beer to the Park Police's operation facility "with the intention to share it with his subordinates after their shift."  Pl.'s Statement at 19; *see also* Disciplinary Records at 1–6.

But again, Panarello offers no evidence that these officers share "nearly identical" circumstances to her—e.g., two prior infractions, supervisory responsibilities, and the same deciding officials involved.  Nor is it clear that these incidents are as serious as driving while intoxicated.  So this comparator evidence also falls short.  *See Burley*, 801 F.3d at 302 ("The other comparator evidence also fails to defeat [defendant's] summary judgment motion because [plaintiff] is unable to demonstrate either that other white employees were found to have committed offenses of comparable seriousness, or that they were differently disciplined by the same supervisors who disciplined [plaintiff].").

Panarello also suggests that the Park Police "has offered little in the way of factual comparisons to other similarly-situated employees" to support her removal.  Pl.'s Resp. at 24. But that burden lies with Panarello, not the Park Police.  *Gulley*, 474 F. Supp. 3d at 167 ("[Plaintiff] has the burden to prove his comparators were similarly situated.").  The Park Police did not rely on similarly situated employees to justify Panarello's removal.  Deputy Chief Fear noted that Panarello's "misconduct [was] serious enough to warrant removal, *irrespective of similar cases*."  Removal Decision at 4 (emphasis added).  It is unclear then how any failure by the Park Police to identify comparators is relevant evidence of discrimination or retaliation here.

In any event, Panarello does not dispute that the Park Police *has* removed at least some officers for DWI incidents. *See* Pl.'s Statement ¶¶ 87–88. More, the Park Police allowed Panarello to retire and receive annuity benefits earlier than its rules otherwise allow. *See id.* ¶¶ 63–64; Panarello Dep. Tr. 158:12–16; Def.'s Mem. at 38–39.[14] Although not dispositive, this contrary evidence also undermines Panarello's claim of disparate treatment. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) (allowing courts to consider "any contrary evidence that may be available to the employer").

In sum, Panarello fails to identify a similarly situated Park Police officer who received more favorable treatment for a DWI (or a comparable, serious offense). This failure is enough for the Court to grant the Secretary's motion. *See Walker v. McCarthy*, 170 F. Supp. 3d 94, 108 (D.D.C. 2016) ("At the summary judgment stage . . . where a plaintiff relying on comparator evidence fails to produce evidence that the comparators were actually similarly situated to him, an inference of falsity or discrimination is not reasonable, and summary judgment is appropriate." (cleaned up)). Panarello's other evidence, however, also does not allow her claims to survive summary judgment.

---

[14] Panarello testified that she retired and receives benefits. *See* Panarello Dep. Tr. 154:17–20; *id.* 158:12–16. But she objects to the Secretary's proposed fact of her retirement as "inaccurate and misleading" because she "submitted her retirement paperwork, but still experienced delays in processing" and "attempted interference with her retirement." Pl.'s Statement ¶ 64. Panarello does not offer any support for this proposition, as she must. *See* LCvR 7(h)(1) (requiring "references to the parts of the record relied on" to show a "genuine issue necessary to be litigated"). Nor is it clear how this objection creates a genuine dispute about whether she retired or receives payments. One can experience delays and attempted interference, but still retire. Relying on her deposition testimony then, the Court treats Panarello's retirement and receipt of payments as undisputed.

**2.**

Panarello points to the last chance agreement that the Park Police offered her.  Pl.'s Resp. at 28–30.  To Panarello, this agreement shows that the Park Police used her removal as "leverage to press her to dismiss" *Panarello I.  Id.* at 28.  And thus *Panarello I* "drove the [Park Police's] choice to terminate her." *Id.* at 28.  The Court disagrees.

The Park Police—like other government agencies—offers departing employees a last chance agreement "from time to time."  Rogers Dep. Tr. 38:3–4; *see* Payton-Williams Dep. Tr. 86:1–8 (testifying that the Park Police offered between five to ten last chance agreements during her career).  And "[a]gencies often condition last chance agreements upon the employee's waiver of rights to challenge the adverse action decision, as initially made or eventually executed." *See U.S. Dep't of Air Force v. Fed. Lab. Rels. Auth.*, 949 F.2d 475, 478 (D.C. Cir. 1991).  Indeed, employers can use breaches of these agreements to terminate an employee. *See Knight v. Mabus*, 134 F. Supp. 3d 348, 358 (D.D.C. 2015) ("Defendant points to ample support in the record for its legitimate non-discriminatory reason to remove [plaintiff] from federal service—that [plaintiff] breached the [last chance agreement], which had merely held his removal in abeyance.").  A last chance agreement thus is not per se evidence of retaliation. *Accord Ramey v. Potomac Elec. Power Co.*, 468 F. Supp. 2d 51, 59 n.11 (D.D.C. 2006) ("[O]ffers of compromise or settlement are not probative of discriminatory or retaliatory intent.").

More, Panarello establishes no causal link between her last chance agreement and removal.  The Park Police reached the decision to remove Panarello *before* offering her the last chance agreement. *See* Payton-Williams Dep. Tr. 94:8–20 (testifying that the conversation with Panarello about the last chance agreement took place after Panarello received the Removal Decision).  That is how these agreements work.  They hold a termination in abeyance "to give

the affected employee an opportunity to prove that he or she is worthy of the [Park Police] keeping them as opposed to remov[ing] them." *Id.* 85:10–13. The removal decision is "taken away" after the employee complies with the terms of the agreement for a period. *Id.* 85:15–20. Since the Park Police had already decided to remove Panarello at the time of the last chance agreement offer, her rejection changed nothing.

Simply put, the Park Police's offer of a last chance agreement is not evidence of discrimination or retaliation against Panarello.

**3.**

As with *Panarello I*, Panarello also suggests her removal was retaliation for the *Sabate* lawsuit. *See* Pl.'s Resp. at 30. She contends that her "termination was not a random event," but a "culmination of years of [her] being held back from training, career building assignments, and promotions." *Id.*

But *Panarello I* already rejected a similar theory. As Judge Moss explained, Panarello "point[ed] to no evidence that sex discrimination motivated the Park Police's action," and she "fail[ed] to offer any evidence that the proposed termination was part of a pattern of retaliation against her." *See Panarello I*, 254 F. Supp. 3d at 107. Panarello offers nothing new here for the Court to reach a different conclusion.

Panarello provides no evidence connecting the *Sabate* lawsuit with her removal. There is no suggestion, for example, that the decisionmakers in place during *Sabate* are still in office now, let alone that they somehow orchestrated Panarello's termination. Instead, Panarello relies on a generalized depiction of the Park Police as a "good ol' boys club" in which male officers "did not face the same harsh discipline." Pl.'s Resp. at 30 (cleaned up); *see also* Gaither Aff. ¶¶ 27–30. But allowing such allegations at this stage "would defeat the central purpose of the

summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Panarello's theory also confronts a timing issue. "The temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation." *Walker*, 798 F.3d at 1092. The D.C. Circuit "has often analyzed temporal proximity in terms of months—not years." *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (citing cases). At the time of Panarello's removal, more than *fifteen years* had passed since the *Sabate* lawsuit. *See* Compl., *Sabate v. Babbitt*, No. 98-cv-00929-RCL (D.D.C. Apr. 14, 1998), ECF No. 1. This gap in time militates against any inference that the removal was connected to the *Sabate* lawsuit. *Cf. Pueschel*, 955 F.3d at 167 (affirming dismissal of retaliation claim where fifteen years had elapsed between the EEO complaints and the adverse employment action). The same reasoning applies to Panarello's retaliation theory based on *Panarello I*, which happened four years before her removal. *See* Compl., *Panarello v. Zinke*, Case No. 1:12-cv-01966-RDM (D.D.C. Dec. 7, 2012); *see also* Def.'s Reply at 18.

Once again, Panarello "rest[s] on a theory of retaliation without evidentiary support." *Panarello II*, 788 F. App'x at 20.

### 4.

Panarello next cites a "culture of discrimination and reprisal" within the National Park Service and Park Police. Pl.'s Resp. at 33. She contends that both "have a documented history of discriminating against women and retaliating against the women, who report the discrimination," and that this history repeated itself with Panarello. *Id.* at 9–12. Not so.

Allegations of isolated, discriminatory incidents at far flung parks around the country are unpersuasive here. *See id.* at 11–12. The Park Police is an agency of the National Park Service.

But the Park Police has its own chief and supervisory hierarchy separate from the National Park Service.[15]  And Panarello focuses her claims only on the conduct and personnel within the Park Police.  *See, e.g.*, Compl. ¶ 17 ("Since 2009 and continuing to her termination Ms. Panarello sustained disparate treatment from the National Park Police regarding training opportunities and promotions within her agency.").  She does not identify any policy or person outside the organization involved in her removal.  So any "culture of discrimination and reprisal" at the National Park Service does not save Panarello's claims.

Panarello also tries to paint a picture of a "workplace culture permeated with favoritism and retaliation" within the Park Police.  Pl.'s Resp. at 33–35; *see also id.* at 12–13.  She cites an allegation of "sexual misconduct" against Deputy Chief Fear.  *See id.* at 34.  She claims an officer feared possible retaliation by members of his unit if he reported alcohol in a Park Police facility.  Disciplinary Records at 4.  She repeats her depiction of the Park Police as a "good ol' boys club."  *See* Pl.'s Resp. at 34 (citing Gaither Aff. ¶¶ 27–29).  And she notes that Captain Rogers—who proposed her removal—filed an EEO complaint against the Park Police alleging race discrimination and retaliation.  *See id.*  To Panarello, these other acts show the Park Police's motive or intent against her.  *Id.* at 33.

But such broad strokes are not enough.  *Greene*, 164 F.3d at 675.  As with her comparator evidence, Panarello fails to show how these incidents share circumstances similar to her removal.  The Court cannot infer a pattern of "favoritism and retaliation" based only on isolated examples of others raising (at most) allegations against the Park Police.

---

[15]  The organizational structure for the National Park Service and Park Police is publicly available at https://www.nps.gov/subjects/uspp/office-of-the-chief.htm.

**5.**

Finally, Panarello invites the Court to deny summary judgment because the Park Police failed to retain a recording of the oral presentation that she made in response to her removal.  *See* Pl.'s Resp. at 26–27.  The Court declines to do so.

Panarello invokes the spoliation principle established in *Gerlich v. United States Department of Justice*, 711 F.3d 161 (D.C. Cir. 2013).  There, the D.C. Circuit adopted a rule that "a negative inference may be justified where the defendant has destroyed potentially relevant evidence" if "future litigation was reasonably foreseeable to the party who destroyed relevant records" and the "destroyed records were likely relevant to the contested issue."  *Id.* at 170–71.  It then imposed a negative inference because the employer failed to retain certain records, which made it "more difficult" for some plaintiffs to establish their case and the "relevance of that evidence to the disputed issue of material fact."  *Id.* at 169, 172.

Not so here.  For starters, Panarello offers no evidence that there was a recording of her oral presentation at all.  Panarello *assumes* that there was.  *See* Panarello Aff. ¶ 87; Pl.'s Statement ¶ 47.  But the evidence suggests that the Park Police's practice of recording these oral responses was inconsistent at best.  *See* Rogers Dep. Tr. 73:19–74:9 (testifying that he did not think oral responses were recorded); Payton-Williams Dep. Tr. 82:9–15, 83:11–13 (testifying that not all oral responses are recorded and that she did not recall whether Panarello's oral response was recorded).  The Court declines to impose a negative inference if nothing was destroyed.

 Even if the Park Police did record her oral response, Panarello fails to explain how destroying that recording warrants an inference to preclude summary judgment here.  Panarello contends that, during the oral response, her attorney identified examples of "white, male

officers" that the Park Police treated differently than her.  Pl.'s Resp. at 26.  And that the Park Police's "refusal to acknowledge those examples vitiates [Deputy Chief] Fear's opinion that Ms. Panarello, as supervisor, was held to a higher standard than officers."  *Id.* at 27.

Perhaps.  But all this evidence is already before the Court.  The Park Police does not dispute that Panarello identified comparators in response to her removal.  Pl.'s Statement ¶ 48 ("In her response, Panarello argued that the discipline was improper because she believed it exceeded penalties for other officers.").  And Panarello could identify purported comparators using the Park Police's own disciplinary records.  *See* Pl.'s Resp. at 30–32; Disciplinary Records.  She also attests to how the Park Police reacted to her comparators during the oral response.  *See* Panarello Aff. ¶ 87 (attesting that Deputy Chief Fear disputed her examples as "rumor"); *id.* ¶ 88 (attesting that Deputy Chief Fear denied that a Park Police captain was "involved in a DUI accident in New York" for which he was not disciplined).  If the recording were to exist, it would not advance Panarello's claims.  Its absence does not make it harder for Panarello to prove her claims or resolve a disputed, material fact.  *See Gerlich*, 711 F.3d at 169, 172.

More, the spoliation principle in *Gerlich* protects against destroying records uniquely in the possession of the employer.  *Id.* at 171 (describing records as containing the employer's "annotations highlighting reasons for 'deselection' and the accompanying internet printouts attached to support a particular 'deselection' decision").  That is not the case here.  Panarello and her attorney had the same—if not more—opportunity and motivation to record the remarks made during the oral response, including how the Park Police reacted to the proposed comparators. Since both Panarello and the Park Police had an equal chance to create and retain the record allegedly destroyed, an inference against the Secretary is inappropriate here.

At bottom, the Court cannot infer retaliatory or discriminatory intent for destroying a recording that either never existed or would not offer new evidence to support Panarello's claims. *See Burley*, 801 F.3d at 300 n.2 (rejecting spoliation inference for potential destruction of videotape where plaintiff failed to show that the tape existed or that failure to review it was obvious error to support a finding of discrimination).[16]

\* \* \*

In sum, Panarello has not produced sufficient evidence for a reasonable jury to find that the DWI was not the actual reason for her removal.  The Court will grant the Secretary's motion for summary judgment on the retaliation and discrimination claims.

## C.

One final issue remains.  Panarello alleges in passing that her treatment "constituted a discriminatory, hostile work environment . . . in violation of her rights under federal law." Compl. ¶ 18.  Construing this allegation liberally, the Secretary seeks summary judgment on any hostile work environment claim that Panarello tries to raise.  *See* Def. Mem. at 41–45.  It argues that Panarello did not exhaust her administrative remedies on this claim and, in any event, no evidence supports a hostile work environment.  *Id.* at 41.  The Court need not reach the merits of these arguments.

In this district, "if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).

---

[16]  If Panarello tries to rely on the Park Police's failure to retain any notes taken during the oral response, *see* Pl.'s Resp. at 27, that theory fails for the same reasons discussed.  Panarello does not identify what information in these notes would further support her retaliation or discrimination claims or resolve a genuine dispute of material fact.  *See Gerlich*, 711 F.3d at 169, 172.

For her part, Panarello makes no effort to respond to the Secretary's exhaustion argument. *See* Def.'s Reply at 22. She argues only that the "record shows that [she] was constructively discharged and subjected to a hostile work environment." *See* Pl.'s Resp. at 25 (cleaned up).[17] But that puts the cart before the horse. Panarello is silent on how she exhausted her administrative remedies to allow her to now raise a hostile work environment claim here. She thus concedes the issue. *See Wannall*, 775 F.3d at 428; *see also* LCvR 7(b).

This concession is fatal. Since Panarello fails to show how she exhausted her administrative remedies, the Secretary is entitled to summary judgment on any hostile work environment claim that Panarello sought to raise in her complaint. *Accord Burke v. Inter-Con Sec. Sys., Inc.*, 926 F. Supp. 2d 352, 356 (D.D.C. 2013) (finding defendant's arguments on hostile work environment claim conceded where plaintiff "initially alleged that he was the victim of . . . a hostile work environment, but he failed to oppose the defendant's motion for summary judgment" on this claim in his opposition and sur-reply).

## IV.

For all these reasons, Defendant's motion for summary judgment will be granted. A separate Order will issue.

Dated: January 11, 2021

_____
TREVOR N. McFADDEN, U.S.D.J.

---

[17] Citing Panarello's passing reference of "constructive discharge," the Secretary also argues that Panarello failed to exhaust her administrative remedies for this claim as well. *See* Def.'s Reply at 23 n.7. The Court need not consider this argument. The complaint alleges no constructive discharge claim. And Panarello cannot raise new causes of action in her opposition brief. *See Jo v. District of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment."). Panarello thus did not properly raise a constructive discharge cause of action.